*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name:  11a0309p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

DASSAULT SYSTEMES, SA,

　　　　　　　　　　*Plaintiff-Appellee,*

　　*v.*

No. 10-1987

KEITH CHILDRESS, dba Practical Catia
Training,

　　　　　　　　　　*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 09-10534—Lawrence P. Zatkoff, District Judge.

Decided and Filed:  December 13, 2011

Before:  MARTIN, MOORE, and COOK, Circuit Judges.

_____

**COUNSEL**

**ON BRIEF:** Douglas P. LaLone, RADER, FISHMAN & GRAUER PLLC, Bloomfield
Hills, Michigan, for Appellee.  Keith Childress, Algonac, Michigan, pro se.

_____

**OPINION**

_____

KAREN   NELSON   MOORE,   Circuit Judge.    Plaintiff-Appellee Dassault
Systemes, SA ("Dassault") filed suit against Defendant-Appellant Keith Childress, d.b.a.
Practical Catia Training ("Childress"), seeking damages for copyright and trademark
infringement, unfair competition, and Michigan Consumer Protection Act violations
arising from Childress's allegedly unauthorized use of Dassault's name and software
licenses to operate a for-profit training course.  Upon final judgment for Dassault,
Childress filed a notice of appeal challenging a number of the district court orders,

1

including the denial of Childress's motion to set aside entry of default judgment, the grant of Dassault's motion for leave to subpoena the FBI, the denial of Childress's motion to strike certain paragraphs from Dassault's complaint, and the judgment entry and order for a permanent injunction. For the reasons set out below, we **REVERSE** the district court's order denying Childress's motion to set aside entry of default judgment, **VACATE** the award of damages in Dassault's favor and the order for a permanent injunction, and **REMAND** for further proceedings. Because we generally agree with the district court's assessment of both the Federal Rule of Criminal Procedure 6(e) nondisclosure requirements and Childress's motion to strike, we **AFFIRM** the district court's judgment on those issues.

## I. BACKGROUND & PROCEDURE

### A. Factual Background

For about fifteen years, Childress has owned and operated Practical CATIA, a small business that trained individuals to use the computer-aided design program CATIA, which was developed by the French company Dassault. Dassault owns the copyrights for its CATIA software products, including the CATIA V5 software at issue in this case. Dassault has also registered the CATIA trademark with the United States Patent and Trademark Office ("USPTO"). Citing the potential for confusion and the similarity of the marks and underlying services, the USPTO denied Childress's request for a trademark on the name "Practical Catia Training" in August 2003.

In 2001, Childress obtained the initial license for Dassault's CATIA V5 software through IBM, which was a business partner of Dassault and was involved in licensing CATIA software. The license was issued to the name "G. Bailey and Associates," which Childress asserts was the original name of his business and was located at Childress's address. The license agreement provided for one annual nodelock license that permits the CATIA software to be used on a single computer based on a unique Target ID. Childress paid the approximately $2,380 yearly fee for that license from 2002 until 2010.

The parties do not dispute that Childress operated CATIA software on multiple computers during the course of his training classes. Childress claims that IBM and MSC, which is a business partner of IBM and an authorized CATIA reseller, began providing additional licenses in 2001 in exchange for Childress's willingness to provide sales leads and to place MSC advertising on his website. According to Childress, an agreement with MSC provided that IBM would supply Practical CATIA with fully functional licenses for use in the training courses, as well as temporary licenses for students' personal use. Although Childress admitted to copying his single nodelock license to multiple computers, Childress maintains that he was merely implementing a "workaround" provided by MSC that avoided certain problems with the license server used to access the software on the training computers. R. 55 (Childress Aff. ¶¶ 59–61).

Dassault counters that Childress had no such licenses, and that Childress instead conducted his training courses using bootlegged copies of the CATIA software created from his single legitimate license. Dassault maintains that Childress illegally cloned the Target IDs and software to permit him to upload the software onto multiple additional machines. According to Dassault, any software issues requiring a "workaround" were the result of Childress's attempts to operate unlicensed and illegitimate copies of the CATIA software. R. 54-3 (Clarkson Aff. ¶ 15).

## B. Procedural History

On October 30, 2006, the FBI executed a search warrant for Practical CATIA's office and training site, during which time it confiscated twenty computers alleged to contain "bootlegged" copies of the CATIA software in violation of federal copyright law. R. 55 (Childress Aff. ¶ 74). The search warrant authorized the agents to seize records, documents, correspondence, and other materials pertaining to alleged violations U.S. copyright law. Grand jury subpoenas issued to Childress, G. Bailey and Associates, and Practical Catia on the same date broadly sought access to any records or materials associated with Childress's training business, and therefore encompassed the materials seized in the FBI raid. The FBI ultimately declined to prosecute the case.

Dassault filed its civil complaint on February 12, 2009. In his initial response to Dassault's complaint, Childress sought an extension, which the district court granted. The district court ordered Childress to file an answer by March 27, 2009. Childress proceeded to file a number of other motions that purported to respond to the complaint, but he never filed an answer. On April 1, 2009, for example, Childress filed a Federal Rule of Civil Procedure 12(e) motion for a more definite statement, which the district court denied; the district court then ordered Childress to file his answer within thirty days of the court's May 22 order. Childress's response to that order was a Rule 12(f) motion to strike information from the complaint, which he filed on June 25, 2009. Along with the motion to strike, Childress also filed a letter explaining why he filed the Rule 12(f) motion in lieu of the answer that the district court had demanded.

Because Childress had yet to file a responsive pleading, Dassault filed a motion for default judgment on July 6, 2009. On October 27, 2009, the district court entered an order directing Childress to show cause why default judgment should not be entered. Childress responded by explaining that he believed in good faith that his actions were permitted under the Federal Rules of Civil Procedure. Childress indicated that he had filed the initial motion for a more definite statement to avoid disclosing confidential information related to the grand jury investigation. After entering the grand jury subpoenas and search warrants into the record, Childress filed a motion to strike, instead of an answer, based on his belief that the filing was his only recourse to Dassault's inclusion of allegedly secret grand jury information in its complaint.

Childress subsequently filed a handful of additional motions, seeking, among other things, reconsideration of earlier court orders and a stay against the district court's order permitting Dassault to issue a subpoena to the FBI. Finally, on December 7, 2009, after determining Childress's show-cause response to be insufficient to justify his failure to file a responsive pleading, the district court granted Dassault's motion for default judgment. Childress then filed a motion on January 27, 2010, requesting that the district court set aside the entry of default judgment. On July 20, 2010, the district court denied Childress's motion and, after considering the parties' motions addressing the appropriate

measure of damages, entered both a permanent injunction against Childress's further use of the CATIA software and a judgment in Dassault's favor in the amount of $964,465 plus attorney fees and costs.  Childress filed this timely appeal.

## II.  ANALYSIS

### A.  The District Court's Entry of Default

Childress first contends that the district court abused its discretion by failing to set aside the entry of default after he demonstrated good cause in accordance with Rule 55(c) of the Federal Rules of Civil Procedure.  To evaluate fully the merits of that argument, we must, as a preliminary matter, address an issue that appears to have created some inconsistencies within our precedents:  the application of Rule 55(c), which permits a court to set aside a default or default judgment for good cause, versus the application of Rule 60(b), which grants relief from final judgments.

Under either rule, our review invokes the well-established factors set forth in *United Coin Meter Co. v. Seaboard Coastline Railroad*, which assess "whether (1) the default was willful, (2) a set-aside would prejudice plaintiff, and (3) the alleged defense was meritorious."  705 F.2d 839, 844 (6th Cir. 1983).  Although the elements are the same, the standard for applying them to a motion to set aside a final default judgment under Rule 60(b) is more demanding than their application in the context of a motion to set aside an entry of default under Rule 55(c). *O.J. Distrib., Inc. v. Hornell Brewing Co.*, 340 F.3d 345, 352 (6th Cir. 2003).

The ambiguity in this case stems from the following course of events.  Dassault framed its initial motion as a request for default judgment, and the district court granted the motion in those terms.  The final entry of default judgment, however, did not occur until July 20, 2010, after the district court fully considered the damages question and determined the amount that Childress owed.  Prior to the judgment entry, Childress filed a "motion to set aside order granting plaintiff's motion for entry of default judgment or to set aside entry of default judgment."  R. 49.  The district court denied Childress's "motion to set aside default" in a July 20, 2010 order.  *Dassault Systemes, SA v.*

*Childress*, No. 09-10534, 2010 WL 2854339 (E.D. Mich. July 20, 2010). In doing so, the district court did not identify which standard applied, but "out of caution" analyzed Childress's request to set aside the entry of default under the Rule 55(c) analysis. *Id.* at *4. The district court ultimately concluded that Childress could not meet the requirements to set aside default under either Rule 55(c) or Rule 60(b). *Id.* at *7.

Because of the initial grant of default judgment and the timing of Childress's motion to set aside entry of default judgment, it is not immediately clear which rule should have been applied. At first blush, the district court's grant of Dassault's motion for *default judgment* suggests that Rule 60(b) should apply. But, because final judgment was not entered until after Childress filed his motion to set aside entry of default judgment, applying the Rule 60(b) standard to a motion challenging a not-yet-final default judgment seems premature.

We have previously differentiated between the Rule 55(c) "good cause" standard and the Rule 60(b) standard for setting aside a default judgment as follows:

> Once a defendant fails to file a responsive answer, he is in *default*, and an entry of *default* may be made by either the clerk or the judge. A *default judgment* can be entered by the clerk only if a claim is liquidated or, if a claim is unliquidated, by the judge after a hearing on damages. A *default* can be set aside under rule 55(c) for "good cause shown," but a default that has become final as a *judgment* can be set aside only under the stricter rule 60(b) standards for setting aside final, appealable orders.

*Shepard Claims Serv., Inc. v. William Darrah & Assocs.*, 796 F.2d 190, 194 (6th Cir. 1986) (internal quotation marks omitted). Subsequent cases have clarified that the stricter Rule 60(b) standard for setting aside a default judgment applies "once [the default] has ripened into a judgment," meaning "*once the court has determined damages and a judgment has been entered.*" *O.J. Distrib., Inc.*, 340 F.3d at 353 (emphasis added) (internal quotation marks omitted); *Waifersong, Ltd. v. Classic Music Vending*, 976 F.2d 290, 292 (6th Cir. 1992) ("[O]nce the court has determined damages and a judgment has

been entered, the district court's discretion to vacate the judgment is circumscribed by public policy favoring finality of judgments and termination of litigation.").[1]

These rulings are also consistent with the well-established rule that Rule 60(b) applies only to final, appealable judgments. *See* 12 James Wm. Moore et al., *Moore's Federal Practice* §§ 60.22(3)(b), 60.23 (3d ed. 2000); *cf. Berthelsen v. Kane*, 907 F.2d 617, 620 (6th Cir. 1990) (noting that "a default judgment may be vacated only by satisfying the stricter standards applied to *final, appealable orders* under Fed. R. Civ. P. 60(b)"). An order granting default judgment without any judgment entry on the issue of damages is no more than an interlocutory order to which Rule 60(b) does not yet apply. *See Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1364 n.27 (11th Cir. 1997) ("When the amount of damages is in dispute . . . only the court may enter judgment, and then only after determining the amount of damages. There can be no 'judgment' without a determination of relief. Thus, the document entitled 'default judgment' in this case is more properly termed simply a 'default.'" (citation omitted)); *Dow Chem. Pac. Ltd. v. Rascator Mar. S.A.*, 782 F.2d 329, 335–36 (2d Cir. 1986) (stating that absent a determination on damages, the court's entry of default judgment "was in fact no more than another interlocutory entry of default," and determining that the defendant would have been entitled to move to set aside the default under Rule

---

[1]We acknowledge that our prior precedent, *INVST Financial Group, Inc. v. Chem-Nuclear Systems, Inc.*, 815 F.2d 391 (6th Cir.), *cert. denied*, 484 U.S. 927 (1987), is somewhat inconsistent with these rulings. In fact, the procedural posture of that case was quite similar to the one at hand: the district court's grant of the plaintiff's motion for default judgment was followed by the defendant's motion opposing the entry of default judgment well before the district court conducted any hearing on damages. *Id.* at 396–97. *INVST Financial Group, Inc.*, however, was preceded by *Shepard Claims* and *United Coin Meter*, which both indicate that as a matter of procedure, a judge does not enter a default judgment until after the damages have been ascertained. *Shepard Claims*, 796 F.2d at 194 (stating that "a *default judgment* can be entered . . . by the judge *after a hearing on damages*" (second emphasis added)); *United Coin Meter*, 705 F.2d at 844 (discussing the procedural steps to default judgment and indicating that after entry of default, the defendant can seek to have the default set aside under Rule 55(c); if the defendant's "motion is not made or is unsuccessful, *and* if no hearing is needed to ascertain damages, judgment by default may be entered by the court" (emphasis added) (internal quotation marks omitted)).

Although it cited the correct standards, the *INVST* court assumed without analysis that the order granting default judgment actually qualified as "an order that has become final as a *judgment*" and that the Rule 60(b) standard therefore applied. *INVST Fin. Group*, 815 F.2d at 398. Had it properly applied *Shepard Claims* and *United Coin Meter*, however, the *INVST* court could not have concluded that an order granting a motion for default judgment issued prior to any hearing on the issue of damages qualified as a final judgment for purposes of applying the Rule 60(b) standard. Insofar as *INVST* conflicts with our earlier published decisions differentiating between the applicable standards for entry of default and default judgment, we are bound by those earlier decisions. *United States v. Caruthers*, 458 F.3d 459, 472 n.6 (6th Cir. 2006).

55(c)).  Thus, absent entry of a final default judgment, the more lenient Rule 55(c) standard governs a motion to set aside a default or default judgment.  *FDIC v. Francisco Inv. Corp.*, 873 F.2d 474, 478 (1st Cir. 1989).

In granting Dassault's motion for default judgment, the district court indicated that "[j]udgment [would] enter *after* the issue of damages is resolved."  R. 40 (Dec. 7, 2009 Op. & Order at 6) (emphasis added).  The final default-judgment entry on the docket was filed on July 20, 2010.  Because Childress filed his motion to set aside entry of default judgment on January 27, 2010, well before the district court entered a final judgment, we conclude that the Rule 55(c) "good cause" standard should be applied.

We review for abuse of discretion the district court's denial of Childress's motion to set aside entry of default judgment under Federal Rule of Civil Procedure 55(c).  *O.J. Distrib., Inc.*, 340 F.3d at 352.  Because of our general preference for judgments on the merits, however, "a 'glaring abuse' of discretion is not required for reversal of a court's refusal to relieve a party of the harsh sanction of default."  *United Coin Meter*, 705 F.2d at 846.  Our review is therefore a "forgiving" one, *United States v. $22,050.00 U.S. Currency*, 595 F.3d 318, 322 (6th Cir. 2010), and applies a "less deferential species of abuse of discretion rather than the normal abuse of discretion review," *id.* at 324.  In conducting this review, we "construe[ ] all ambiguous or disputed facts in the light most favorable to the defendant[ ]," resolving any doubts in his favor.  *INVST Fin. Group, Inc.*, 815 F.2d at 398 (alterations in original).

Childress's argument rests on the assertion that the district court's analysis of the three relevant factors presented an unfair evaluation of the facts.  In particular, Childress argues that the district court (1) failed to take into account his "meritorious defenses"; (2) improperly determined that Dassault would be prejudiced; and (3) too hastily dismissed his "credible explanation" for failing to comply with the court order requiring him to file an answer to Dassault's complaint.  *See* Appellant Br. at 25–30, 31–38, 38–45.  We agree as explained below.

### 1. Childress's Culpability

The district court's decision to deny Childress's motion to set aside entry of default judgment was based in large part on its perception that Childress had engaged in deliberately dilatory motions practice—including ignoring two court orders that he file an answer—rather than answering Dassault's complaint. *Dassault*, 2010 WL 2854339, at *4–5. "To be treated as culpable, the conduct of a defendant must display either an intent to thwart judicial proceedings or a reckless disregard for the effect of its conduct on those proceedings." *Shepard Claims Serv.*, 796 F.2d at 194.

Although we sympathize with the district court's exasperation at Childress's numerous lengthy filings, we do not agree that the facts support the conclusion that Childress was engaged in an egregious motions practice that embodied a "calculated strategy to delay these proceedings and avoid discovery." Appellee Br. at 37. Concededly, it is possible that Childress was intentionally undermining Dassault's discovery efforts. More likely, however, is that Childress, as a pro se litigant, was merely attempting to navigate the none-too-intuitive labyrinth of procedural rules. Indeed, his show-cause response, the letter accompanying his Rule 12(f) motion, and a sworn affidavit of his cousin, Lisa Oliver, a legal secretary, which documents his confusion and his attempts to reach out to her for assistance in interpreting the Federal Rules of Civil Procedure, all support this view. Furthermore, Childress filed his motion to set aside entry of default judgment within a reasonable time after the district court entered the order. This also weighs against the district court's finding that Childress was intentionally disrespectful of the court proceedings. *Shepard Claims Serv.*, 796 F.2d at 194. Taking these facts in the light most favorable to Childress as our precedent requires, we do not believe that the culpability factor weighs as heavily in the equation as the district court concluded. *See Krowtoh II LLC v. Excelsius Int'l Ltd.*, 330 F. App'x 530, 537 (6th Cir. 2009) (assessing a foreign defendant's culpability for failing to respond to court orders and concluding that "[w]hile the facts suggest that [defendant] made a conscious—although misguided—decision to ignore the district court

proceedings, his explanation demonstrates that he did not intend to disrespect the court proceedings").

### 2.  Prejudice

Dassault maintains that it has experienced prejudice due to (1) Childress's attempts to thwart discovery, which Dassault for the first time asserts could result in its inability to retrieve data from the computers because of the potential that the machines "freez[e] up due to inaction[,] which means the data on these [hard] drives may be spoiled," Appellee Br. at 31; (2) Childress's continued operation of his training facilities in violation of Dassault's copyrights, causing avoidance of royalty payments, frustration of competition, and diminished copyright value; and (3) increased legal fees due to discovery issues and the need to defend against "baseless motion[s]," *id.* at 32.

"[D]elay alone is not a sufficient basis for establishing prejudice." *INVST Fin. Group*, 815 F.2d at 398 (internal quotation marks omitted).  Nor does increased litigation cost generally support entry of default.  *$22,050*, 595 F.3d at 325.  Instead, "it must be shown that delay will result in the loss of evidence, create increased difficulties of discovery, or provide greater opportunity for fraud and collusion." *INVST Fin. Group*, 815 F.2d at 398 (internal quotation marks omitted).  Additionally, the relevant inquiry concerns the future prejudice that will result from reopening the judgment, not prejudice that has already resulted from the defendant's conduct. *Berthelsen*, 907 F.2d at 620–21.

Taking each of Dassault's arguments in turn, we conclude that the district court also gave undue weight to the prejudice element of the *United Coin Meter* analysis. Initially, we observe that Dassault's newly presented assertion that the hard drives of the computers in the FBI's possession could freeze up and destroy the evidence is completely unsupported, and appears to be a questionable attempt to reframe its argument into one that demonstrates a potential loss of evidence.  Dassault's concern about legal fees is similarly unpersuasive.   It goes without saying that further proceedings would have such an impact. *See $22,050*, 595 F.3d at 325 ("[I]t does not make intuitive sense that simply claiming an increase in litigation cost should be sufficient to establish prejudice. Setting aside default will *always* increase litigation cost

to the plaintiff because the plaintiff will actually have to litigate the case."). *But see United States v. Goist*, 378 F. App'x 517, 519 (6th Cir. 2010) (concluding that the need to defend against "additional frivolous filings" can constitute prejudice under the *United Coin Meter* analysis). Thus, this argument also does not strongly militate in Dassault's favor on the issue of prejudice. Finally, Dassault's argument that it is prejudiced by its inability to enforce its intellectual property rights largely boils down to prejudice that resulted from past conduct, which is irrelevant to the question whether to set aside the entry of default. To the extent that Dassault's argument could be construed as addressing prejudice that could result upon reopening the case, it amounts to little more than an assertion of prejudice by delay. Although a trial would likely prolong the time during which Dassault remains uncompensated for alleged violations of its intellectual-property rights, the ultimate purpose of that trial would be to determine whether Dassault is entitled to compensation. To that end, if Childress were found liable, the licensing fees and royalties owed would be assessed as damages and Dassault would presumably be made whole upon successfully demonstrating Childress's alleged infringement. The prejudice element therefore is significantly less compelling than the district court concluded, and it does not weigh heavily in favor of denying Childress's motion.

### 3. The Existence of a Meritorious Defense

Childress finally raises a number of defenses, which he claims have the potential to absolve him of liability for copyright and trademark infringement. These include express and implicit license, fair use, copyright and trademark estoppel, statute of limitations, and trademark laches. Because it determined the first two elements (culpability and prejudice) to weigh heavily against Childress, the district court erroneously skipped any analysis of Childress's purported meritorious defenses. Despite the district court's failure to consider them, we may nonetheless evaluate those defenses on appeal. *See Amernational Indus., Inc. v. Action–Tungsram, Inc.*, 925 F.2d 970, 977 (6th Cir.), *cert. denied*, 501 U.S. 1233 (1991).

A defense is "meritorious" if it is "good at law." *$22,050*, 595 F.3d at 326 (quoting *Williams v. Meyer*, 346 F.3d 607, 614 (6th Cir. 2003)). Attempting to

demonstrate that Childress does not meet this prerequisite, Dassault engages in a lengthy evaluation of the merits of each of Childress's defenses.  But the test is not whether a defense is likely to succeed on the merits; rather, the criterion is merely whether "there is some possibility that the outcome of the suit after a full trial will be contrary to the result achieved by the default." *Id.* (quoting *Burrell v. Henderson*, 434 F.3d 826, 834 (6th Cir. 2006)).  Thus, even conclusory assertions may be sufficient to establish the "hint of a suggestion" needed to present a meritorious defense.  *Id.* (internal quotation marks omitted).

Childress correctly points out that he is not obligated at this stage to provide detailed factual allegations.  *See id.* (noting the absence of any factual allegations and the conclusory nature of the defenses, but nonetheless concluding that the asserted defenses were meritorious as the term is defined in the context of setting aside default).  Even so, Childress presented the district court with factual allegations and legal arguments to support each of his asserted defenses.  Although he may not succeed on the merits of those defenses, that does not foreclose a determination that at least one of his asserted defenses may meet the relatively lenient "good at law" standard.

The statute-of-limitations defense satisfies the hint-of-a-suggestion requirement, particularly in light of Dassault's inconsistent statements concerning when the company actually learned of the alleged infringement.  Indeed, although Dassault's later motions and its appellate brief adamantly maintain that it learned of the possible copyright infringement as a result of the FBI investigation, Dassault initially stated that it had informed the FBI of Childress's alleged infringement. *Compare* R. 53 (Pl.'s Br. in Opp. to Mot. to Set Aside Order at 17) ("The FBI conducted its raid in October of 2006, giving rise to Dassault's knowledge of the infringement and starting the clock for accrual of an infringement claim.  Once Dassault learned that the FBI would take no action to protect its valid copyrights, Dassault filed suit in February of 2009; well within the three year period."), *with* R. 12 (Pl.'s Mot. for Entry of a Protective and Privacy Act Order at 1) ("Dassault informed the FBI about Childress' illegal activity.  The FBI ultimately conducted a raid on Childress' business and seized his computers.").  This discrepancy

raises the possibility that Dassault's infringement claims were barred by the statute of limitations. *See* 17 U.S.C. § 507(b) (prohibiting copyright-infringement claims that are filed more than three years after they accrued). Childress has thus raised at least one defense that presents "some possibility" of a different outcome. "All that matters is whether a well-stated defense, if sustained, would change the outcome." *$22,050*, 595 F.3d at 326. Childress meets this burden.

### 4. Rebalancing the *United Coin Meter* Factors

After reweighing the *United Coin Meter* factors based on the above analysis, we conclude that the balance does not tip in Dassault's favor. Childress has met his burden of demonstrating a possibly meritorious defense, and the prejudice element also does not tilt strongly toward Dassault. Furthermore, even if there were some culpability on Childress's part, there is not evidence to support an "intent to thwart judicial proceedings or a reckless disregard for the effect of its conduct on those proceedings," particularly given his status as a pro se defendant. *Shepard Claims Serv.*, 796 F.2d at 194. The balance of those factors is thus insufficient to support the district court's refusal to set aside the entry of default. *Cf. Waifersong, Ltd.*, 976 F.2d at 293 (stating that where "defendants came perilously close to articulating the existence of a meritorious defense . . . and demonstrating the absence of substantial prejudice to plaintiffs, . . . it would require particularly culpable conduct by the defendants to outweigh those two factors and tip the balance toward denial of relief"). Our conclusion is particularly appropriate in light of the precedential directive that "[a]ny doubt should be resolved in favor of the petition to set aside the judgment so that cases may be decided on their merits." *United Coin Meter*, 705 F.3d at 846 (internal quotation marks omitted). We therefore reverse the district court's order denying Childress's motion to set aside entry of default judgment, its order granting Dassault's motion for default judgment, and its July 20, 2010 default-judgment entry, and remand for proceedings consistent with this opinion.[2]

---

[2]We note also that given the above analysis on the three *United Coin Meter* elements, we would have reached the same result even under the stricter Rule 60(b) standard. Though perhaps misguided, Childress's responses did not demonstrate the level of culpability required to preclude a determination of excusable neglect under Federal Rule of Civil Procedure 60(b)(1). Coupled with a possibly meritorious defense and a lack of significant prejudice to Dassault, relief even from final default judgment would have

**B. The FBI Subpoena**

Childress next asserts that the district court erred when it granted Dassault's motion to subpoena the FBI for access to the documents and computers that were seized during the FBI's execution of the search warrant in 2006. According to Childress, access to that information would violate the presumption of nondisclosure afforded by Rule 6(e) of the Federal Rules of Criminal Procedure because the FBI seizures were made pursuant to a grand jury investigation.[3]

We review the district court's decision to permit disclosure of grand jury materials for abuse of discretion. *United States v. Alpha Med. Mgmt., Inc.*, No. 96-5825, 1997 WL 359065, at *5 (6th Cir. June 26, 1997) (unpublished opinion) (citing *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 223 (1979)). Federal Rule of Criminal Procedure 6(e) creates an obligation of secrecy that prevents certain persons from disclosing "a matter occurring before the grand jury." FED. R. CRIM. P. 6(e)(2)(B). "[C]onfidential documentary information not otherwise public obtained by the grand jury by coercive means is presumed to be 'matters occurring before the grand jury.'" *In re Grand Jury Proceedings*, 851 F.2d at 866. Thus, even documents that were originally prepared in the ordinary course of business are presumptively "matters occurring before the grand jury" when they have been requested pursuant to a grand jury investigation. *FDIC v. Ernst & Whinney*, 921 F.2d 83, 87 (6th Cir. 1990).

"Mere contact with a grand jury, however, does not change every document into a matter 'occurring before a grand jury' within the meaning of Rule 6." *United States v. Rutherford*, 509 F.3d 791, 795 (6th Cir. 2007). Rather, a party can rebut the

---

been warranted. *See Waifersong*, 976 F.2d at 292 (stating that when a defendant falls within one of the Rule 60(b)(1) categories, relief should be granted if he can also show a meritorious defense and an absence of substantial prejudice).

[3]After the district court granted leave to do so, Dassault issued a subpoena to the FBI requesting "[a]ll computers, materials and documents that were seized at Keith Childress' business, Practical Catia, at the address of . . . ." R. 38 (Emergency Mot. for Stay Ex. C). Because the subpoena did not contain a particularized description of the information sought and its relevance to Dassault's case, the FBI has not agreed to turn over the requested information. R. 17 (Ex. 6) (citing 28 C.F.R. §§ 16.21–16.29, which governs the disclosure of information pertaining to Department of Justice business by current or former Department of Justice employees, as justification for the FBI's refusal).

presumption that the sought-after materials should be so classified by demonstrating that "the information is 'public or was not obtained through coercive means or that disclosure would be otherwise available by civil discovery and would not reveal the nature, scope, or direction of the grand jury inquiry.'" *Id.* (quoting *In re Grand Jury Proceedings*, 851 F.2d at 866–67).

Because the search warrants and grand jury subpoenas were issued on the same date and to the same FBI special agent, the district court correctly erred on the side of determining that the investigations were linked and that computers and records were obtained via the grand jury's coercive process. As a result, the district court assumed that the presumption against nondisclosure applied.[4] The question then becomes whether Dassault can overcome the presumption by demonstrating that the materials did not in fact constitute "matters occurring before the grand jury." Childress does not dispute the district court's determination that both the computers and the business records would be discoverable as relevant evidence. Thus, our analysis begins with the question whether those materials would "reveal the nature, scope, or direction of the grand jury inquiry."

We evaluated a similar question in *United States v. Alpha Medical Management, Inc.*, No. 96-5825, 1997 WL 359065, at *5 (6th Cir. June 26, 1997). There, we determined that the business records at issue would not reveal information concerning the grand jury inquiry, stating:

---

[4]It is an open question in this circuit whether materials sought pursuant to a search warrant issued at about the same time as a grand jury subpoena fall within the scope of "matters occurring before the grand jury." The Fourth Circuit, in an opinion addressing a similar issue held that, as long as the search warrant is not a de facto grand jury process, the materials obtained pursuant to that warrant generally will not be subject to Rule 6(e) disclosure restrictions, even if a parallel grand jury investigation is occurring simultaneously. *See In re Grand Jury Subpoena*, 920 F.2d 235, 243 (4th Cir. 1990); *see also In re Grand Jury Matter*, 682 F.2d 61, 64 (3d Cir. 1982) ("The disclosure of information obtained from a source independent of the grand jury proceeding, such as a prior government investigation, does not violate Rule 6(e)." (internal quotation marks omitted)). The Fourth Circuit's decision, however, was based on a close evaluation of the facts, which made clear that the "IRS investigation and the grand jury investigation were not indiscriminately merged [and] that the initial IRS investigation was conceived and initiated without any connection to a grand jury proceeding." *In re Grand Jury Subpoena*, 920 F.2d at 243. In this case, the district court merely assumed that the investigations were related and, perhaps because the parties presented no facts addressing the relatedness of the FBI and grand jury investigations, did not conduct a specific factual inquiry. We need not resolve that issue on appeal.

>    Although the grand jury's subpoena of these records reveals that the
>    investigation must in some way be correlated to the business affairs of
>    Alpha, the fact that the grand jury subpoenaed *all* of Alpha's records for
>    a certain time period makes any link between these records and the
>    determination of the nature or direction of the investigation tenuous.
>    Furthermore, because these records were prepared in the ordinary course
>    of business, this information would not tend to reveal the substance of
>    the grand jury inquiry, as might be the case with records prepared by
>    prosecutors or transcripts of witness testimony.

*Id.* A similar line of reasoning can be applied in this case. Dassault asserts that "100% of the requested materials in [its] subpoena existed in the ordinary course of Childress' business," and that its subpoena deliberately "did not seek any of the substance of grand jury testimony, the identity of any grand jury witness(es), FBI investigative notes, or the like." Appellee Br. at 42–43 (emphasis omitted). Although the search warrants that defined the records to be seized by the FBI sought materials specifically related to violations of U.S. copyright law, the grand jury subpoenas sought a broad swath of materials, including records pertaining to Childress's software and hardware licenses and expenses, client lists, design work, student enrollment, income, as well as any other records related to Childress or his business. Given the scope of the grand jury's potential investigation, it is unlikely that Dassault's attempt to obtain only the computers and business records that the FBI seized will shed light on the scope or substance of the grand jury investigation. That the information Dassault seeks is limited to preexisting computers and business records makes it further unlikely that the disclosure would somehow reveal the scope or nature of the grand jury inquiry. The district court therefore did not abuse its discretion in determining that Dassault had rebutted any presumption that the materials sought in its subpoena were matters occurring before the grand jury.

## C.  Motion to Strike

Childress next argues that the district court erred by denying his motion to strike certain paragraphs from Dassault's complaint, which Childress maintains revealed "secret" information concerning the grand jury investigation that was protected under Federal Rule of Criminal Procedure 6(e). Federal Rule of Civil Procedure 12(f) permits

a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "We review the decision to grant or deny a motion to strike for an abuse of discretion, and decisions that are reasonable, that is, not arbitrary, will not be overturned." *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 480 (6th Cir. 2003) (internal quotation marks omitted).

Federal Rule of Criminal Procedure 6(e)(2) applies only to grand jurors; interpreters; court reporters; operators of recording devices; persons transcribing recorded testimony; attorneys for the government; and persons to whom disclosure is made under Rule 6(e)(3)(A)(ii) or (iii), which encompasses government personnel assisting in the enforcement of federal law. The rule imposes no obligation of secrecy on persons or entities that are not included on that list. *United States v. Jeter*, 775 F.2d 670, 675 (6th Cir. 1985); *see also* 1 Charles Alan Wright & Andrew D. Leipold, *Federal Practice and Procedure* § 106 (4th ed. 2008). Thus, the district court correctly determined that Dassault "is a private corporation not implicated by the restrictions of Rule 6(e)(2)." *Dassault Systemes, SA v. Childress*, No. 09-10534, 2009 WL 3602084, at *5 (E.D. Mich. Oct. 27, 2009). Indeed, even if the FBI did improperly disclose information, Dassault, as a non-covered entity, is not sanctionable under Rule 6(e)(2) for that disclosure.[5] Accordingly, Dassault's allegations were neither immaterial nor scandalous, and the district court did not abuse its discretion in refusing to strike them.

**D. Right to a Jury Trial**

Childress's final argument centers on his right to a jury trial. Specifically, Childress argues that the district court violated his Seventh Amendment rights when it entered damages against him without affording him the trial he requested in his opposition motion to Dassault's statement of damages and proposed injunctive relief. Because we are reversing and remanding due to the district court's erroneous refusal to set aside the entry of default judgment, we need not address whether the district court

---

[5]Although Childress is correct in his observation that the limited scope of Federal Rule of Criminal Procedure 6(e) does not prevent a court's imposition of other statutory penalties arising from the disclosure of protected grand jury information, *see Jeter*, 775 F.2d at 675, Childress offers no basis for imposing such penalties here.

erred in denying Childress's request for a jury trial, and instead we vacate the district court's damages award in favor of Dassault and its order granting Dassault's request for a permanent injunction.

### III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment in part and **REVERSE** in part.  We **REVERSE** the district court's orders granting Dassault's motion for default judgment and denying Childress's motion to set aside entry of default judgment, **VACATE** the permanent injunction against Childress and the default-judgment entry awarding damages to Dassault, and **REMAND** for proceedings consistent with this opinion.  Because we agree with the district court's conclusion that the materials Dassault seeks from the FBI are not comprised of protected grand jury information, we **AFFIRM** the district court's judgment that Dassault's subpoena does not violate Federal Rule of Criminal Procedure 6(e).  For the reasons stated above, we also **AFFIRM** the district court's denial of Childress's motion to strike.